UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

MICHAEL GREENE, and )
DEBBIE BERNIER, on behalf of )
E.G. their minor child )
 )
　　Plaintiffs, )
 )
　　v. ) 2:18-cv-00141-JAW
 )
NEW ENGLAND SUZUKI )
INSTITUTE, )
 )
　　Defendant. )

## ORDER ON MOTION FOR PRELIMINARY INJUNCTION

A student's parents seek preliminary injunctive relief against the operator of a summer educational program requiring it to allow them to participate alongside their daughter in the 2018 program scheduled to begin on June 24, 2018—a mere two days from now.  The Plaintiffs allege that the organization's decision to ban them from participation in the 2018 program constitutes retaliation against them for their assertion and advocacy for the right of their daughter under the Americans with Disabilities Act (ADA) to accommodation of her allergy to animal fur and saliva, such retaliation also being in violation of the Act.  The Defendant organization opposes the motion, arguing that its decision to ban the Plaintiffs was motivated by their aggressive, confrontational, and threatening behavior and language.  The Defendant organization affirms, and the Plaintiffs acknowledge, that the Defendant organization has welcomed the Plaintiffs' daughter to participate in the 2018 program unaccompanied or with a chaperone who is not one of her parents.  The

organization states that she is in fact enrolled. Therefore, the only relief the parents seek against the organization is for permission for them, as opposed to E.G., to attend.

The Court denies the parents' motion for preliminary injunction because it concludes that they have failed to show that they are likely to succeed on the merits of their retaliation claim, that the balance of the relevant impositions absent an injunction tips in their favor, that an injunction would advance the public interest, and that the harm they stand to experience without injunctive relief is irreparable.

## I. BACKGROUND

### A. Procedural Background

On April 2, 2018, Michael Greene and Debbie Bernier, parents and guardians of E.G., filed a complaint. *Compl.* (ECF No. 1). New England Suzuki Institute (NESI) answered on May 10, 2018. *Answer* (ECF No. 5). On May 15, 2018, the Plaintiffs filed a motion for a preliminary injunction. *Pls.' Mot. for Prelim. Inj. with Incorporated Mem. of Law* (ECF No. 8) (*Pls.' Mot.*). On June 4, 2018, NESI filed its response in opposition to the motion along with the declarations of three of its staff: Assistant Director Wendy Sawicki, Co-Director Yasmin Vitalius, and President Elizabeth Sellers. *Def.'s Obj. to Pls.' Mot. for Prelim. Inj.* (ECF No. 9) (*Def.'s Opp'n*); *Def.'s Opp'n* Attach. 1 *Decl. of Wendy Sawicki* (*Sawicki Decl.*); *Def.'s Opp'n* Attach. 2 *Decl. of Yasmin Vitalius* (*Vitalius Decl.*); *Def.'s Opp'n* Attach. 3 *Decl. of Elizabeth Sellers* (*Sellers Decl.*). On June 14, 2018, the Plaintiffs filed their reply together with declarations by each of them. *Reply Mem. in Support of Pls.' Mot. for Prelim. Inj.*

(ECF No. 10) (*Pls.' Reply*); *Pls.' Reply* Attach. 1 *Decl. of Michael Greene* (*Greene Decl.*); *Pls.' Reply* Attach. 3 *Decl. of Debbie Bernier* (*Bernier Decl.*).

## B. Factual Background[1]

### 1. The Parties

The Plaintiffs are residents of Windham, Maine. *Compl.* ¶ 5.

E.G. is a 12-year old aspiring musician pursuing her musical education through the Suzuki Method. *Compl.* ¶ 8; *Pls.' Mot.* at 1. She has a disability in the form of a severe, potentially life-threatening allergy that can be triggered by exposure to animal fur and saliva. *Compl.* ¶ 9; *Pls.' Mot.* at 2. An allergic reaction can quickly compromise her ability to breathe, speak, and swallow. *Compl.* ¶ 9; *Pls.' Mot.* at 2. E.G.'s treating physician has recommended that she avoid exposure to animals. *Compl.* ¶ 10; *Pls.' Mot.* at 2; *Pls.' Reply* Attach. 4 *Letter of Jane Ho, M.D.*

---

[1]    In its response to the Plaintiffs' motion for preliminary injunction, NESI observed that they had failed to comply with the requirements of Federal Rule of Civil Procedure 65, which contemplates that a court may consider the contents of "specific facts in an affidavit or a verified complaint." *Def.'s Opp'n* at 12-13. The Plaintiffs' Complaint was not verified, and they failed to supply any affidavits in support of their motion for preliminary injunction. *Compl.* at 9; *Pls.' Mot.* at 1-14. In their June 13, 2018 reply, the Plaintiffs filed three sworn declarations and an exhibit. *Pls.' Reply* Attachs. 1-4. The sworn statements submitted by the Plaintiffs effectively track the allegations in the Complaint and therefore for efficiency, the Court referenced the Complaint and the attorneys' characterization of the record.

On June 19, 2018, NESI moved to file a sur-reply by June 26, 2018, which the Court denied, because the proposed sur-reply filing date would have been beyond the June 24, 2018 commencement of the summer program. *Def.'s Mot. for Leave to File Sur-reply to Pls.' Reply* (ECF No. 15); *Order* (ECF No. 16).

As here, a ruling on a motion for preliminary injunction is often a matter of urgency. Therefore "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 725 (4th Cir. 2016) ("Preliminary injunctions . . . are governed by less strict rules of evidence"). In reciting the facts, the Court attempted to fairly characterize the respective positions of the parties on the underlying facts, even where they dispute certain events.

NESI is a Maine-based 501(c)(3) nonprofit organization with a principal place of business in Portland, Maine. *Compl.* ¶ 6; *Def.'s Opp'n* at 10.

### 2. The Suzuki Method

The Suzuki Method was developed by Japanese violinist Shinichi Suzuki. *Compl.* ¶ 8 n.1 (citing Suzuki Association of America www.suzukiassociation.org/ about/suzuki -method). He applied the basic principles of language acquisition to the learning of music. *Id.* The method's central features are: parent responsibility, loving encouragement, constant repetition, individual and group lessons, and lessons designed to build music skills within the context of the music rather than technical exercises. *Id.* Parental involvement is a key feature. *Id.* Parents attend lessons with the child and serve as "home teachers." *Id.*

### 3. The NESI Summer Program

The NESI summer program is held in Standish, Maine. *Id.* . ¶ 6. NESI offers a week-long music program for children each June at Saint Joseph's College of Maine on Sebago Lake. *Id.* ¶ 11. NESI's program is the only summer program featuring the Suzuki Method in the southern Maine region. *Id.* ¶ 11; *Pls.' Mot.* at 1. The program consists of music lessons for students of a variety of string instruments and culminates in a student performance at the end of the week. *Compl.* ¶ 12. An important component of the NESI program is the involvement of a child's parents. *Compl.* ¶ 13; *Pls.' Mot.* at 2. The fundamental components of the NESI program are related to musical instruction, practice, and performance and do not include anything that would require the presence of animals at the program location. *Compl.* ¶ 15;

*Pls.' Mot.* at 2. Animals are not part of the NESI program, but the administrators have an informal practice of allowing families to bring pets to the program. *Compl.* ¶ 16; *Pls.' Mot.* at 2.

### 4.   E.G.'s and Plaintiffs' Participation in the NESI Summer Program

E.G. and the Plaintiffs have attended the NESI summer program for the past seven years. *Compl.* ¶¶ 2, 13; *Pls.' Mot.* at 2. The Plaintiffs have been fully involved in E.G.'s Suzuki-Method music training and have attended the NESI program with her each summer. *Compl.* ¶ 14; *Pls.' Mot.* at 2. Attendance at NESI each summer is an important family event for the Plaintiffs. *Compl.* ¶ 14; *Pls.' Mot.* at 2.

The Plaintiffs state that they have provided at least three letters regarding E.G.'s allergy from the doctor to NESI. *Compl.* ¶ 10; *Pls.' Mot.* at 2. NESI maintains that prior to 2016, NESI was completely unaware that E.G. had allergies or needed to be kept away from furred animals. *Def.'s Opp'n* at 17. It also represents that the Plaintiffs first raised the issue upon seeing a therapy dog accompanying another student at the 2016 summer program. *Id.*

### 5.   The Presence of a Dog at the 2016 Summer Program, the Plaintiffs' Complaints, and NESI's Response

One of the participating families brought a therapy dog to the 2016 program. *Compl.* ¶ 17; *Pls.' Mot.* at 3. The Plaintiffs were told that the dog was a service dog for one of the students, but they later learned that the dog was not specially trained to perform work for the student as required by the ADA; instead it was a therapy dog that did not accompany the student at all times. *Compl.* ¶ 17 n.2; *Pls.' Mot.* at 3.

Because of the risk posed to E.G. by the presence of a dog at the program, the Plaintiffs requested that NESI make an accommodation for E.G. so that she would be able to access the summer music program without danger of being exposed to the dog. *Compl.* ¶ 18; *Pls.' Mot.* at 3. NESI states that on June 26, 2016, the Plaintiffs first made NESI Assistant Director Wendy Sawicki aware of E.G.'s allergy to dogs. *Def.'s Opp'n* at 4. Plaintiffs provided the NESI administration with a clear explanation that she needed a learning space, performance space, and eating area free from animals, animal fur, and animal saliva. *Compl.* ¶ 19; *Pls.' Mot.* at 2, 3. NESI characterizes the Plaintiffs as having been agitated, confrontational, angry, and antagonistic in their interactions with NESI about the dog. *Def.'s Opp'n* at 2, 4-5. When NESI requested documentation from E.G.'s physician, Plaintiffs provided it. *Compl.* ¶ 19. According to the Plaintiffs, NESI assured them that E.G. would not be in the same classroom with the student and the dog, but made no effort to keep the dog out of other areas of the facility including the dining area. *Id.* ¶ 20; *Pls.' Mot.* at 3.

NESI describes its actions as "major steps to make sure that both [E.G. and the student with the therapy dog] could be fairly accommodated throughout the one-week session." *Def.'s Opp'n* at 2. Ms. Sawicki consulted the class schedule and determined that E.G. and the student with the therapy dog did not share any classes but did have a class in a mutual classroom; E.G. was in the classroom in the morning and the other student was in the same classroom in the afternoon. *Id.* at 4. Ms. Sawicki asked both families if they would sit in opposite parts of the classroom in the

6

same seat each day, and both families agreed to do this. *Id*. Ms. Sawicki arranged to have the room cleaned each night. *Id*. at 4, 17. NESI states that, on July 1, 2016, the Plaintiffs first expressed a concern that the therapy dog was in the cafeteria at the same time as E.G. *Id*. at 4. An agreement was reached to ensure that the two did not sit near each other and any area where the therapy dog was sitting was cleaned each night. *Id*. at 17.

According to NESI, before the final concert, Mr. Greene told NESI in a threatening manner that there "would be trouble" if their request to ban the therapy dog from the open-air tent were not granted. *Id*. at 2, 5. Ms. Sawicki spoke with the family of the student with the therapy dog about the Plaintiffs' concerns, and the family expressed a countervailing concern that they did not want to be segregated out of the final concert and wanted to be able to see the event. *Id*. at 6.

The family, along with the therapy dog, was seated in the third row from the very back of the concert area. *Id*. Mr. Greene engaged in a very agitated conversation with Clorinda Noyes, a Co-Director of NESI. *Id*. He confronted Ms. Sawicki aggressively and told her that she was "supposed to take care of this problem" and suggested that Ms. Sawicki had not done so. *Id*. Mr. Greene demanded that the therapy dog be outside the tent, even though it was nowhere near where the Plaintiffs would be sitting or where E.G. was present. *Id*. Ms. Sawicki then asked the family to sit in the back row of the tent and have the dog lie behind the chair which would have the dog just outside the tent, and the family complied. *Id*. Mr. Greene challenged the father of the student with the therapy dog as to whether his child

needed to have a trained therapy animal. Mr. Greene demanded that the dog be moved to the other side of the building which would have prevented the father of the student with the therapy dog from seeing the concert. *Id*. at 6, 17. Nonetheless, the father of the student with a therapy dog volunteered to sit at the edge of the building which, though he could not see his daughter's concert, at least allowed him to hear it. *Id*. Ms. Sawicki's interactions with Mr. Greene caused her to become fearful. *Id*. at 7.

### 6.     The Presence of Dogs at the 2017 Summer Program, the Plaintiffs Complaints, and NESI's Response

Prior to the 2017 summer session, the Plaintiffs reminded the NESI administrators of E.G.'s disability accommodation and made additional requests that animals not be allowed in proximity to E.G. in the classroom as well as the performance area and dining area. *Compl.* ¶ 21; *Pls.' Mot.* at 3. NESI indicated that it would only provide E.G. with an animal-free classroom for her lessons, but it would not be able to provide an animal-free eating area or performance space. *Compl.* ¶ 22; *Pls.' Mot.* at 3. NESI did not change its informal practice of allowing pets and did not ask the participants and their families to leave their pets at home during the week. *Compl.* ¶ 23; *Pls.' Mot.* at 3.

For the most part, E.G. did not encounter animals during the week-long program. *Compl.* ¶ 24. However, at the student performance at the conclusion of the week, some NESI families brought their pet dogs to the performance. *Id.* ¶ 25; *Pls.' Mot.* at 3. When the Plaintiffs noticed that dogs were at the concert and that the dog handlers were entering the performance space, the Plaintiffs became concerned that

E.G. might come in to contact with allergens and have a reaction that would disrupt her performance and potentially cause a life-threatening reaction. *Compl.* ¶ 26; *Pls.' Mot.* at 3-4.

NESI describes the Plaintiffs' response as "hyperaggressive and bellicose." *Def.'s Opp'n* at 18. NESI indicates that there were two dogs a significant distance from the open tent where the final concert was being held. *Id*. at 1, 7, 9. At all times, the dogs were under control of handlers. *Id*. at 9. The Plaintiffs spoke with the dog handlers, disclosed that E.G. suffered from a severe allergy, and asked them to take their pets away from the performance areas. *Compl.* ¶ 27; *Pls.' Mot.* at 4. The dog handlers complied with the Plaintiffs' request. *Compl.* ¶ 27. Ms. Sawicki understood that one dog was placed in a car, despite the eighty-degree heat, at Mr. Greene's request. *Def.'s Opp'n* at 7. However, one dog remained just outside the performance space and was handled by various children who were not aware that the dog was not allowed inside or near the performance space. *Compl.* ¶ 27. Ms. Sawicki told Ms. Bernier and Mr. Greene that, as long as the dogs were not in the tent, everything should be fine. *Def.'s Opp'n* at 7.

Later during the 2017 concert, Ms. Sawicki was approached again by Ms. Bernier and Mr. Greene who were very agitated and angry. *Id.* They suggested that the dogs came up to the tent, but Ms. Sawicki did not believe that to be the case. *Id*. NESI Co-Director Yasmin Vitalius spoke to both families with dogs and asked that they keep their dogs away from the tent, and both families complied with her request. *Id*. at 9.

At conclusion of the performance, the Plaintiffs spoke with NESI administrators about having to confront people during the performance. *Compl.* ¶ 28; *Pls.' Mot.* at 4. They expressed their distress and concern that NESI's inaction in the face of their request for disability accommodation for their daughter had caused a potentially dangerous situation for her. *Id.* The Plaintiffs state, "[i]n an attempt to convey the weight of their concern and the seriousness of their daughter's condition, Plaintiffs drew a parallel between what it felt like for them to see a person with a pet dog getting near to E.G. with what it might feel like for any parent to see a person with a gun in proximity to children." *Compl.* ¶ 29; *Pls.' Mot.* at 4. Ms. Bernier states that she said, "What if someone brought a gun, would you just stand there and do nothing like you are doing now?" *Bernier Decl.* ¶ 13.

NESI recounts the episode differently, stating that "[Ms.] Bernier became extremely angry and threatened to bring a firearm to NESI so, according to her, everyone else could feel what she described as her level of anxiety . . . ." *Def.'s Opp'n* at 1. According to NESI, Ms. Bernier said to NESI Co-Director Yasmin Vitalius, "What do I have to do? Bring a gun to the concert to let people know how uncomfortable we feel? If I had a gun, I would be approached immediately." *Id.* at 8, 18. NESI also describes the interaction this way:

> After the concert [Ms.] Bernier approached [Ms.] Sawicki and said, "Can I ask you a question?" and [Ms.] Sawicki said that she would certainly answer a question. It was at this point that [Ms.] Bernier said in an agitated and intense way "How would you feel if we brought a loaded gun to this campus?"

*Id.* at 7.  According to the Plaintiffs, at the time this conversation took place, the NESI administrators involved in this conversation did not express alarm at the analogy and did not indicate that the Plaintiffs' statements were understood as threatening in any way.  *Compl.* ¶ 29; *Pls.' Mot.* at 4.  However, NESI states that the comment was "terrifying" and "disturbing," causing Ms. Sawicki to become "shocked" and "extremely alarmed." *Def.'s Opp'n* at 8.  NESI observes that Ms. Sawicki did not know if the Plaintiffs had a gun at that time, whether they were going to get a gun, or whether they would bring a gun to NESI in the future.  *Id.*  NESI connects Ms. Sawicki's reaction to news media accounts of school shootings.  *Def.'s Opp'n* at 8.  NESI states that Ms. Vitalius' reaction was similar.  *Id.* at 9.  Ms. Vitalius took the comment as extremely alarming and threatening, "especially given the way that [Ms. Bernier] said it in a very agitated manner." *Id.*

In July, Plaintiffs received a letter from NESI's attorney accusing them of making a comment that "was incredibly disturbing, inappropriate, and could have been taken as a direct or veiled threat." *Compl.* ¶ 30; *Pls.' Mot.* at 4.  The letter also stated, "In this day and age, making suggestions about bringing firearms to an area where parents, children, and families are present is especially wrong." *Compl.* ¶ 30.  The letter indicated that NESI had "made a record" of the statement for future action, *id.*, and that NESI had reported the alleged threats to the police.  *Pls.' Mot.* at 4.

### 7.    NESI Bans the Plaintiffs from Participating  in the 2018 Summer Program

In the fall of 2017, NESI's Board met and decided that, though E.G. was welcome to attend NESI in 2018, neither of the Plaintiffs would be allowed to attend

with her.  *Def.'s Opp'n* at 2, 8, 11.  On October 25, 2017, NESI's counsel sent a letter to the Plaintiffs.  *Id*. at 11; *id*. Attach. 4 *October Letter* (*October Letter*).  The letter stated that due to Plaintiffs' "suggestions that [they] would bring firearms to a children's concert to make attendees feel threatened," they would not be permitted to participate in the NESI program in 2018.  *Compl.* ¶ 31; *Pls.' Mot.* at 4; *October Letter*. The letter characterized the Plaintiffs' behavior as "threatening[,] highly objectionable[,] . . . severe[,] and very disturbing." *October Letter*.  The 2018 program is scheduled for June 24-30.  *Pls.' Mot.* at 1.  This letter also indicated that NESI had reported the incident to law enforcement.  *Compl.* ¶ 31; *October Letter*.

Plaintiffs attempted to enroll E.G. in the program in January 2018.  *Compl.* ¶ 32; *Pls.' Mot.* at 5.  They listed themselves as attending with E.G. despite having been previously informed that they were not allowed to attend.  *Def.'s Opp'n* at 11; *Def.'s Opp'n* Attach. 5 *January Letter* (*January Letter*).  On January 24, 2018, NESI's counsel sent a letter to the Plaintiffs indicating that they were barred from attending the program with E.G. and asking whether they wished to designate someone else to act in their place.  *Compl.* ¶ 32; *Pls.' Mot.* at 5; *Def.'s Opp'n* at 11; *January Letter*. Subsequent communication from NESI referenced E.G.'s father's behavior during the 2016 program as "confrontational and aggressive." *Compl.* ¶ 33; *Pls.' Mot.* at 5.  The Plaintiffs understood this reference to be about the multiple discussions they had with NESI administrators about E.G.'s need to avoid contact with dogs and other furred animals.  *Pls.' Mot.* at 5.[2]

---

[2]     At approximately 2:30pm today, June 22, 2018, the Plaintiffs filed with the Court the supplemental declaration of Mr. Greene, along with two exhibits containing email correspondence

## II.   LEGAL STANDARD

"[Injunctive relief] is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012); *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011); *accord Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).   To determine whether to issue a preliminary injunction a court must analyze four factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant]; (3) the balance of the relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 17-18 (1st Cir. 2006) (quoting *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004)).

---

between Mr. Greene and personnel at St. Joseph's College. *Suppl. Decl. of Michael Greene* (ECF No. 17) (*Suppl. Decl.*); *id.* Attachs. 1-2.  The first exhibit is a message from Mr. Ian MacEachen, Director of Campus Safety and Security at St. Joseph's, to Mr. Greene regarding the NESI summer program. *Suppl. Decl.* Attach. 1 *MacEachen Email* (*MacEachen Email*).  Exhibit 2 is comprised of an exchange between Mr. Greene and Tracy Albert, St. Joseph's Director of Conferences, Events, and Catering, regarding some of Mr. Greene's family's engagements on the campus of St. Joseph's unrelated to NESI. *Suppl. Decl.* Attach. 2 *Albert Emails*.

The supplemental declaration and Exhibit 1 indicate that St. Joseph's College, in light of having received information regarding the subject matter of this litigation, has decided to bar the Plaintiffs and E.G. from the campus. *Suppl. Decl.* ¶ 3 ("Saint Joseph's College . . . has barred me and my family from the campus beginning at 4:00pm today"); *id.* ¶ 5 ("[MacEachen] provided an account of its reasons for barring my wife and me from the NESI camp"); *id.* ¶ 13 ("As the college has now taken action adverse to me and my family, barring us all . . . "); *MacEachen Email* at 1 (in an email addressed to Mr. Greene only and expressing a desire to speak with him, "the College is inclined to disallow you from access to our facility.  I understand that this would have a negative effect on your daughter's ability to continue her attendance at Suzuki camp . . ." and indicating that NESI will refund any tuition that has been collected with respect to E.G.'s enrollment).

The decision of St. Joseph's College—not a party to this litigation—may affect the legal theories under which the Plaintiffs seek preliminary injunctive relief.  However, in light of the urgency of this matter and the fact that NESI has not had an opportunity to respond to the supplemental declaration, the Court issues this order based solely upon the facts as the parties presented them prior to the filing of the supplemental declaration and exhibits.

"The party seeking [an injunction] bears the burden of establishing that these four factors weigh in its favor." *Id.* at 18. However, "[t]he sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002); *see Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 7 (1st Cir. 2012) (confirming that this factor is the "most important part of the preliminary injunction assessment") (citation omitted). A preliminary injunction is an extraordinary and drastic remedy, which is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). Ultimately, "trial courts have wide discretion in making judgments regarding the appropriateness of such relief." *Francisco Sánchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2009).

## III. THE PARTIES' POSITIONS[3]

### A. Likelihood of Success on the Merits

#### 1. The Plaintiffs' Position

The Plaintiffs argue that NESI retaliated against them for seeking a reasonable accommodation for E.G.'s disability—which constitutes protected activity

---

[3]     Although the Plaintiffs frame their claim for injunctive relief under both Count I, disability discrimination under the ADA, and Count II, retaliation for assertion of rights under the ADA, the Court views their claim for injunctive relief—not the claims in the overall Complaint—as resting on retaliation, not on reasonable accommodation for E.G.'s disability. For example, by their motion, the Plaintiffs are not seeking to force NESI to keep dogs away from E.G. or to ban dogs from NESI grounds. There is no allegation in the claim for injunctive relief that NESI will not seek to accommodate E.G. next week or into the future. Instead, the Plaintiffs' claim for injunctive relief is grounded on the parents' claim that NESI is retaliating against them for asserting rights on behalf of E.G. by refusing to allow them to be present. Accordingly, the Court views the parents' request for injunctive relief as based on Count II, not Count I.

    It may be possible to shoehorn the parents' demand to be present at next week's program as a reasonable accommodation for E.G.'s disability. But NESI allowed the parents to attend in the past

14

under the ADA. *Pls.' Mot.* at 9. They point to their advocacy for E.G. in the form of repeatedly requesting an animal-free environment at the summer program. *Pls.' Reply* at 2. They claim to have expressed their frustration that NESI had not provided the accommodation and repeatedly discussed the importance of the accommodation for E.G.'s attendance at NESI. *Pls.' Mot.* at 10. NESI decided to bar Plaintiffs from the program based on these conversations. *Id.* The Plaintiffs point to correspondence from NESI notifying them of its decision to bar them, in which NESI specifically references a conversation Plaintiffs had with NESI administrators on the last day of the summer 2017 session and discussions administrators had with Plaintiffs during the 2016 session. *Id.* They underscore that the subject of these conversations was E.G.'s need for an accommodation. *Id.* They say this is evidence of the nexus between their advocating for an accommodation and NESI banning them. *Id.* Likewise, they observe that the subject matter of each of the interactions during which NESI describes their behavior as combative, angry, or troubling was the issue of dogs and E.G.'s allergy. *Pls.' Reply* at 2-3. In the same vein, the Plaintiffs state that NESI administrators were not comfortable talking to the Plaintiffs about keeping furred animals away from E.G. *Id.* at 3. They point to these facts as illuminating a retaliatory intent behind a decision to bar them taken in direct response to their protected activity under the ADA. *Id.*

---

and the record strongly indicates that the only reason NESI is not allowing them to attend next week is NESI's view that the parents were disruptive, which the parents view as retaliatory. Therefore, it is difficult to see Count I as a proper basis for injunctive relief. Even so, the Court is not convinced that the result would be any different either way.

The Plaintiffs dismiss NESI's allegation that they threatened to bring a firearm to NESI as false and as a pretext to justify its decision to ban them. *Pls.' Mot.* at 10. They state that they did not threaten to bring a gun to NESI. *Pls.' Reply* at 3. They also contend that NESI's reference to news media coverage of mass shootings of children "is a logical fallacy, attempting to appeal to fear that is completely irrelevant to the issues of this case." *Id*. at 4. The Plaintiffs claim that they have never behaved toward NESI participants or staff in any manner that is reckless, threatening, or dangerous. *Pls.' Mot.* at 4.

## 2. The Defendant's Position[4]

As a threshold matter, NESI argues that the Plaintiffs' motion is moot because NESI welcomes E.G.'s attendance at the 2018 program and there is no requirement that she be accompanied by the Plaintiffs or any other chaperone. *Def.'s Opp'n* at 3, 13.

NESI asserts that the Plaintiffs cannot carry their burden of showing that it retaliated against them because of their alleged protected activity, and for no other reason. *Id*. at 14-15. NESI maintains that its decision to ban the Plaintiffs stemmed exclusively from their "angry, combative, and threatening conduct." *Id*. at 15.

NESI argues that, even if the Plaintiffs were able to make out a prima facie case of retaliation in violation of the ADA, the claim would fail at the pretext analysis stage. *Id*. NESI vigorously opposes the Plaintiffs' assertion that its stated reason for

---

[4]   In their opposition, NESI criticizes the Plaintiffs' failure to have filed any affidavits, declarations, or documentary evidence accompanying their motion. *Def.'s Opp'n* at 2-3, 12-13. The Plaintiffs responded by each filing their own declaration, along with two exhibits, with their reply brief. *Pls.' Reply* Attachs. 1-4. These filings address NESI's point.

banning the Plaintiffs is pretextual. They state, "[a]t a time when school shootings are rampant, and not a week goes by where there is not a major news story about an angry person taking out their frustration on innocent children with firearms, [Ms.] Bernier's comment was no laughing matter." *Id.* at 1. They argue that the decision to ban the Plaintiffs was fair and appropriate given the "highly incendiary remarks that were made by [Ms.] Bernier and the adversarial conduct of [Mr.] Greene." *Id.* at 2. They aver that the decision was motivated by a legitimate non-discriminatory reason—desire to maintain the "peace, security and safety of those attending NESI in 2018." *Id.* at 2, 15. NESI denies that the decision to ban the Plaintiffs had anything to do with their advocacy for E.G., and was rather made entirely because of their "intimidation and hostility." *Id.* at 9.

### B. Potential for Irreparable Harm to the Movant

#### 1. The Plaintiffs' Position

The Plaintiffs argue that they and E.G. will be directly and adversely affected if NESI excludes them from the summer music program in June 2018. *Pls.' Mot.* at 5. They claim that if E.G. attends the program without them, she will not be receiving equal benefits of a full participant considering the fact that parental participation is a central component of the Suzuki Method. *Id.* at 5, 10; *Pls.' Reply* at 4. This would cause E.G. to not fully benefit from an important family, educational, and community event that has been part of her life for seven years. *Pls.' Mot.* at 11. They also state that this would render the program she experiences unequal to that afforded to the other students. *Pls.' Reply* at 4-5.

They claim that E.G.'s opportunity for the experience provided by the NESI program at this point in her music education cannot be replaced or made-up later. *Pls.' Mot.* at 11. They describe each summer program as "a singular opportunity in the course of a child's musical education." *Id.* at 11. The Plaintiffs also claim that, because of her disability, E.G. is unable to participate in many of the more traditional summer camp experiences which have outdoor activities and interaction with animals as fundamental features of the program. *Id.* at 11

The Plaintiffs further aver that E.G. will likely not want to attend the program without the participation of her parents thereby losing out on a singular experience that has been an important family event for several years. *Id.* at 5. They reiterate that E.G. cannot make up this lost experience in some other way. *Id.* at 5.

### 2. The Defendant's Position

The NESI has states that E.G. is enrolled for the 2018 summer session and it welcomes her to attend. *Def.'s Opp'n* at 2. They also state that children of E.G.'s age are allowed to attend unaccompanied by a parent. *Id.* at 2, 19. NESI welcomes her attendance unaccompanied or with a chaperone who is not one of her parents. *Id.* at 2. NESI states that the Plaintiffs' attendance is neither necessary nor required. *Id.* at 19. Thus, NESI concludes, there is no irreparable harm to the Plaintiffs. *Id.* at 14.

### C. Balance of the Relevant Impositions

### 1. The Plaintiffs' Position

As discussed above, the Plaintiffs argue that E.G.'s opportunity to participate in a singular educational, family, and community experience is jeopardized by their

inability to participate in the 2018 program. *Pls.' Mot.* at 11. The key issue, they claim, is that the ban on their attendance removes one of the program's central features available to other participants—parental involvement. *Id.* at 11. The Plaintiffs claim that their participation imposes no burden upon NESI. *Id.* at 12. They dismiss NESI's contention that they pose a danger as "patently ridiculous." *Id.* at 12.

### 2. The Defendant's Position

NESI argues that the balance of the equities tips in its favor because its need to provide for the peace, safety, and security of other NESI participants is at stake. *Def.'s Opp'n* at 14. It maintains that the Plaintiffs' statement in 2016 that there "would be trouble" and Ms. Bernier's discussion of bringing a gun to a NESI concert presented real safety and security concerns. *Id.* at 19. It contends that the Plaintiffs have brought this consequence upon themselves through their behavior. *Id.* at 19.

### D. The Effect of the Ruling on the Public Interest[5]

### 1. The Plaintiffs' Position

The Plaintiffs assert that it is in the public interest for programs such as NESI, to be prohibited from discriminating against or excluding otherwise qualified participants who happen to have disabilities. *Pls.' Mot.* at 12. The Plaintiffs contend that an injunction would advance the public interest in inclusion of persons with disabilities in opportunities to enjoy all of the services which a public accommodation offers. *Id.* at 12.

---

[5]     NESI does not address this factor in its brief. *See Def.'s Opp'n.*

## IV. DISCUSSION

At the outset, the Court addresses NESI's contention that the Plaintiff's motion is moot because NESI welcomes E.G.'s attendance at the 2018 summer program and because there is no requirement that she be accompanied by the Plaintiffs or anyone else. This argument misapprehends the Plaintiffs' motion. The parents state clearly that they acknowledge that, as far as NESI is concerned, E.G. is welcome to attend and that the relief they seek is an order permitting them to participate in the program. The Court rejects NESI's mootness argument.

### A.     The Likelihood of Success on the Merits[6]

Retaliation against a person opposing a discriminatory act or practice is unlawful under the ADA. 42 U.S.C. §12203(a); 28 C.F.R. 36.206(b). Requesting an accommodation is protected conduct for purposes of the ADA's retaliation provision. *Freadman v. Metro. Prop. and Cas. Ins. Co.*, 484 F.3d 91, 106 (1st Cir. 2007); *Kelley*

---

[6]     Pursuant to the Court's observations *supra* footnote 1, the Court assesses the Plaintiffs' likelihood of success on the merits of Count II only. The Court assumes, without deciding, that Ms. Bernier and Mr. Greene have their own right, as opposed to a right derivative of E.G.'s, under the ADA to initiate this ADA retaliation claim. *See* 42 U.S.C. § 12203(a) ("No person shall discriminate against *any* individual because such individual has opposed any act or practice made unlawful by this chapter . . . .") (emphasis supplied); *DeCotiis v. Whittemore*, 842 F. Supp. 2d 354, 369 (D. Me. 2012) (licensed speech-language pathologist and speech-language therapist who provided speech and language therapy and evaluations at various state of Maine Child Development Services (CDS) regional sites could sustain an action for ADA retaliation arising out of one CDS site's response to her efforts to advocate to parents regarding that site's failure to provide public educational services to disabled children); *Cable v. Dept. of Developmental Servs. of State of Cal.*, 973 F. Supp. 937, 941 (C.D. Cal. 1997) (doctor at community placement facility for disabled persons stated ADA retaliation claim arising out of action taken against him after he protested institutional practices he saw as violative of disabled patients' ADA rights); *Stanek v. St. Charles Cmty. Unit Sch. Dist. No. 303*, 783 F.3d 634, 643 (7th Cir. 2015) (parents "sufficiently allege that the District retaliated against them by shutting them out of the special-education process, in violation of  . . . the ADA. The circuits that have addressed the question agree that these statutes protect a parent's request for a school to accommodate a child's disability) (citing *A.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 698 & n. 4 (6th Cir. 2013); *Blanchard v. Morton Sch. Dist.*, 509 F.3d 934, 938 (9th Cir. 2007)).

*v. Corr. Med. Servs.*, 707 F.3d 108, 115 (1st Cir. 2013). Courts analyze an ADA retaliation claim employing the burden-shifting framework drawn from cases arising under Title VII of the Civil Rights Act of 1964. *See Freadman*, 484 F.3d at 106; *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 16 (1st Cir. 1997) (observing that "guidance on the proper analysis of [an] ADA retaliation claim is found in Title VII cases"). To make out a prima facie retaliation claim, the plaintiff must show that: (1) she engaged in protected conduct; (2) she experienced an adverse action; and (3) there was a causal connection between the protected conduct and the adverse action. *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 25 (1st Cir. 2004). While the majority of retaliation cases involve the employment context, the ADA anti-retaliation provision's application is not so limited. *See, e.g., Shotz v. City of Plantation, Fla.*, 344 F. 3d 1161, 1181 n.31 (11th Cir. 2003) (rejecting argument that such an employment-context limitation exists and collecting cases).

Once the plaintiff has made a prima facie showing of retaliation, "the burden shifts to the defendants to offer a legitimate, nonretaliatory reason for their actions." *Collazo-Rosado v. Univ. of P.R.*, 765 F.3d 86, 92 (1st Cir. 2014). If the defendant meets this burden, the plaintiff must show that the proffered legitimate reason is pretextual and that the adverse "action was the result of the defendant's retaliatory animus." *Calero-Cerezo*, 355 F.3d at 26 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993)).

### 1. Prima Facie Case

The parties do not dispute the Plaintiffs have established the first two elements of a prima facie case, so the Court begins with the third: whether there was

a causal connection between the protected conduct—advocating for an accommodation for E.G.—and the adverse action—NESI banning the Plaintiffs from the summer program. As evidence of such a connection, the Plaintiffs emphasize that the subject matter of the discussions, which NESI points to as involving their hostility and combativeness, was their request for accommodation of E.G.'s allergy. This much is true, but even though the Plaintiffs identify a correlation, they fail to establish causation. Moreover, even assuming the Plaintiffs' attempt to draw a causal connection were successful, they would face an even higher hurdle at the next stage of the analysis.

### 2. Legitimate Nonretaliatory Reason

NESI meets its burden of providing a legitimate nonretaliatory reason for banning the Plaintiffs from the summer program: their hostile, aggressive, bellicose, and threatening behavior and language at past summer sessions, including discussion of bringing a gun to a children's concert—language NESI interpreted as threatening.

### 3. Pretext and Causation

The burden shifts back to the Plaintiffs to prove pretext and causation. To do so, they must establish that: (1) NESI's proffered reason for its action is a pretext, and (2) the true reason is unlawful retaliation. *See Udo v. Tomes*, 54 F.3d 9, 13 (1st Cir. 1995).

The combination of the ominous statement in 2016 that there "would be trouble" and the language—even if hypothetical—about bringing a gun to the a children's performance could easily lead a reasonable jury to conclude that NESI's

proffered reason for banning the Plaintiffs was true and valid and that it was not retaliation for their advocacy for E.G. NESI reasonably argues that the Plaintiffs' behavior was not consistent with NESI's mission of providing a positive, peaceful, open, and loving music education experience and conflicted with NESI's obligation to ensure the peace, safety, and security of other students. *Def.'s Opp'n* at 11. NESI argues that the Plaintiffs' aggressive and hostile behavior coupled with their language about bringing a firearm motivated their decision.

The Court's view does not depend on which version of the statement about a gun is more accurate. Even evaluating Ms. Bernier's version of her statement— considerably more favorable to her than the versions recounted by Mses. Sawicki and Vitalius—a reasonable person could take the statement to be threatening and, at a minimum, extremely inappropriate. Tragically, any allusion, even hypothetical, that hints at gun violence—*especially* in the context of a children's educational environment—is likely to elicit alarm. As NESI maintains, it is not just the words that matter but also tone and context.

The Plaintiffs' claims that they have never owned firearms, do not know how to operate them, and are fearful of them, *Greene Decl.* ¶ 9; *Bernier Decl.* ¶ 17, have no bearing on how NESI staff members reasonably perceived Ms. Bernier's language because there is no allegation that the NESI staff had any knowledge of the Plaintiffs' firearms ownership, views, and/or knowledge. The combination of this language, Mr. Greene's prior statement about impending "trouble," and the string of confrontational

interactions among the Plaintiffs and NESI staff make NESI's decision to ban the Plaintiffs reasonable.

The Plaintiffs claim that NESI administrators did not actually feel threatened at the time of the relevant interactions. Even if true, this does not matter. NESI's premise is not that it or its staff felt immediately threatened, *Sawicki Decl.* ¶¶ 11-12; *Vitalius Decl.* ¶ 3, *October Letter*, but rather that Ms. Bernier's comment about a firearm was severe, disturbing, objectionable, and threatening. A listener may perceive a comment to be threatening without herself feeling threatened. The threatening nature could be perceived as the comment is made, or later after the listener processes it. Just because a listener herself does not feel threatened at the time does not mean that she cannot perceive a threat to others embedded in the comment.

Moreover, Ms. Bernier's comment did not threaten gun violence in that moment, but in the future. *Bernier Decl.* ¶ 13 ("What if someone brought a gun, would you just stand there and do nothing like you are doing now?"). There is no evidence in this record that either Mr. Greene or Ms. Bernier was actually carrying a firearm when the comment was made, but the implication of the comment, particularly in light of the rash of school shootings in this Country, is that she might do so sometime in the future.

Setting aside whether the comment was actually intended to be threatening, NESI's stated perceptions and rationale go beyond this. Making a single, highly objectionable statement could well be sufficient basis for NESI to ban a participant.

But that is not all NESI points to. It describes the totality of interactions with the Plaintiffs over the course of the 2016 and 2017 summer programs as justifying banning them. Even if NESI's perceptions were somehow wrong, this still would not be enough. *Collazo-Rosado*, 765 F.3d at 92 ("To establish pretext [the plaintiff] must show that the explanation was a lie, which would let a factfinder infer that the defendants made the story up to cover their tracks. It is not enough for her to show that they were wrong or tactless").

The Court is unconvinced by the Plaintiffs' arguments that that this is more likely than not a pretext for a retaliatory motivation. Like a school, NESI is a place where numerous unarmed people gather, and it therefore had a right, even a duty, to take the Plaintiffs at their word and to be concerned that an allusion to someone bringing a gun to NESI was meant to be taken seriously. Indeed, had NESI not acted upon a statement regarding a firearm that NESI interpreted as threatening made by a person NESI considered to be hostile and bellicose, and had that person in fact brought a firearm to the summer program and committed an act of gun violence, NESI's failure to affirmatively respond would have let it open to charges of negligence. This hypothetical illustrates that NESI—having been placed on notice of a possible threat—had an obligation not to ignore the situation that had developed with the Plaintiffs, culminating in the gun comment at the end of the 2017 program.

Just because the Plaintiffs were advocating for accommodation of E.G.'s allergy at the time of the various interactions of note does not mean that NESI's action had anything to do with the subject matter of the conversations. The Court perceives no

"weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in NESI's proffered nonretaliatory reasons for banning the Plaintiffs that would undermine its position. *Harrington v. Aggregate Indus. Ne. Region, Inc.*, 668 F.3d 25, 33 (1st Cir. 2012) (internal citation omitted).

The Court is unable to conclude that the Plaintiffs have shown that they are likely to succeed on the merits of their retaliation claim. While the Court could rest its denial of the motion on this alone, *New Comm Wireless*, 287 F.3d at 9 (without a likelihood of success on the merits, "the remaining factors become matters of idle curiosity"), the Court reviews briefly why none of the remaining factors change the outcome.

### B.    Potential for Irreparable Harm to the Movant

"If the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996) (internal citations omitted). "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004).

The Plaintiffs frame their argument about this factor in terms of E.G. and impacts that their inability to participate in the summer program would have on her. They lean on the centrality of parental involvement to the Suzuki Method, arguing that their inability to participate will result in E.G. receiving a lesser experience from

the summer program than some other participants. The excerpt from the Suzuki Association website that the Plaintiffs submitted lists "Parental Involvement" as one of eight features of the Suzuki Method. *Pls.' Reply* Attach. 2 *About the Suzuki Method* at 1 (*About the Suzuki Method*). The site's description of parental involvement makes clear that attendance at lessons is not all that is contemplated. Instead, parents "serve as 'home teachers' during the week" supporting the child's development and learning outside of the classroom. *About the Suzuki Method* at 1. So, while the Plaintiffs cannot attend the summer program, E.G. is not denied their continued involvement in her Suzuki training. Presumably they can stay abreast of the curriculum and continue to support E.G.'s progress, and their physical presence is but one facet of a dynamic program.

As NESI points out, parental attendance at the summer program is neither required nor necessary. NESI continues to welcome E.G.'s attendance—either unaccompanied or with a chaperone who is someone other than her parents. The Plaintiffs do not dispute these assertions, and both tend to lessen the magnitude of the injury to be inflicted should no injunction issue.

Even taking the harm asserted as a given, the Court is dubious of its irreparability. The Plaintiffs describe the 2018 summer program as singular, and this is true to some degree, but it is distinguishable from other truly one-time, fleeting opportunities. *C.f., Reynolds v. Int'l Amateur Athletic Fed'n*, 505 U.S. 1301, 1302 (1992) (reinstating preliminary injunction to allow athlete to compete in 1992 United States Olympic Trials and finding potential for irreparable harm); *Monga v. Nat'l*

*Endowment for the Arts*, No. 2:18-cv-00156-JAW, 2018 WL 1902683, at *15 (D. Me. Apr. 21, 2018) (being blocked from participating in national poetry competition after having won state finals constitutes irreparable harm). Rather, it is an annual event in which the Plaintiffs have participated with E.G. for seven years. While experiential opportunity costs such as the one Plaintiffs stand to incur tend not to be readily quantifiable as money damages, courts do not always deem them irreparable. *E.g., Khan v. Fort Bend Indep. Sch. Dist.*, 561 F. Supp. 2d 760, 766 (S.D. Tex. 2008) (being banned from high school graduation ceremony and thus rendered unable to deliver valedictorian address does not constitute irreparable harm); *S.B. ex rel. Brown v. Ballard Cty. Bd. of Educ.*, 780 F. Supp. 2d 560, 569 (W.D. Ky. 2011) (rejecting plaintiff student's argument that forced transfer to an alternative school for disciplinary reasons would inflict irreparable harm in the form of exclusion from playing on original school's softball team, attendance at school dances and sporting events, and participation in other school functions extracurricular activities).

The Court finds that the harm the Plaintiffs stand to endure—irreparable or not—is outweighed by their failure to demonstrate that they are likely to prevail on the merits of their ADA retaliation claim.

## C. The Balance of the Relevant Impositions

The Plaintiffs contrast the harm they assert, as discussed above, with what they characterize as no risk or burden for NESI. NESI responds that its ability to ensure the peace, safety, and security of program attendees is at stake.

The Court finds that this factor tips in favor of NESI. NESI asserts concern for the wellbeing of all of its students and other program participants—a consideration more weighty than the completeness of one student's experience. The harm the Plaintiffs stand to experience is in some sense self-inflicted. The record reflects that NESI banned the Plaintiffs on account of their own objectionable behavior and language. Furthermore, denial of the motion for injunctive relief does not impede or prejudice the Plaintiffs' ongoing efforts to seek other relief, including the prayed-for declaratory relief and compensatory and punitive damages. *See Compl.* at 9.

### D.     The Effect of the Ruling on the Public Interest

The Plaintiffs state that the public interest favors nondiscrimination against persons with disabilities. Neither the Court nor NESI quarrels with them about the paramount importance of the policies underlying the ADA. However, the relief the Plaintiffs seek pertains to their retaliation claim, not their discrimination claim. *See supra* n.2.

The Court sees the public interest in allowing NESI to advance its asserted interest in the safety and security of summer program participants in the context of a statement about firearms at a children's concert that it perceived to be threatening. The public interest in safety and security of the community is self-evident and strong. On balance, the Court finds that the public interest in denying the claim for injunctive relief exceeds the public interest in granting the requested relief.

## V.    CONCLUSION

The Court finds that the Plaintiffs failed to demonstrate (1) that there is a likelihood of success on the merits, (2) that the balance of the relevant impositions tips in their favor, and (3) that an injunction would advance the public interest.  Nor does the Court conclude that the Plaintiffs' asserted harm is irreparable.  The Court DENIES the Plaintiffs' Motion for Preliminary Injunction (ECF No. 8).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 22nd day of June, 2018